AO 106
Rev 8/82

**AFFIDAVIT FOR SEARCH WARRANT**

| **United States District Court** | DISTRICT: **WESTERN DISTRICT OF WISCONSIN** | |
|---|---|---|
| United States of America<br><br>v.<br><br>A Five Foot Tall Green Metal Stack On Safe, Serial Number Y610DG000586.<br><br>*SEALED* | DOCKET NO. | MAGISTRATE JUDGE CASE NO.<br>10-MJ-109 |
| | NAME AND ADDRESS OF JUDGE' OR MAGISTRATE JUDGE<br><br>STEPHEN L. CROCKER<br>United States Magistrate Judge<br>120 N. Henry Street<br>Madison, WI 53703 | |

The undersigned being duly sworn deposes and says that there is reason to believe that

| [ ] on the person of<br>[X] on the premises known as | DISTRICT<br>**WESTERN DISTRICT OF WISCONSIN** |
|---|---|

A Five Foot Tall Green Metal Stack On Safe, Serial Number Y610DG000586, currently in the possession of the Madison Police Department.

The following property (or person) is concealed: Firearms, Ammunition, Drug Paraphernalia, Currency, and Narcotics.

Affiant alleges the following grounds for search and seizure²:

**SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED AS PART OF THIS AFFIDAVIT FOR SEARCH WARRANT.**

Affiant states the following facts establishing the foregoing grounds for issuance of a search warrant:

**SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED AS PART OF THIS AFFIDAVIT FOR SEARCH WARRANT.**

| SIGNATURE OF AFFIANT<br><br>*[signature]*<br><br>WILLIAM BAUDHUIN | OFFICIAL TITLE, IF ANY<br><br>Special Agent<br>Bureau of Alcohol, Tobacco,<br>Firearms, and Explosives |
|---|---|

Sworn to before me, and subscribed in my presence

| DATE<br>8-24-10 | MAGISTRATE JUDGE *[signature]* |
|---|---|

---

¹ United States Judge or Judge of a State Court of Record.

² If a search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure 41(c), show reasonable cause therefore.

Exhibit 1    U.S. v. Jeremy Visocky    24

## AFFIDAVIT

STATE OF WISCONSIN)
                 ) ss.
DANE COUNTY    )

William Baudhuin, being first duly sworn on oath, deposes and states as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATFE) and have been employed in this capacity since June of 1990.

2. The facts contained in this affidavit are known to me through my personal knowledge, training and experience, and through information provided to me by others, which I consider to be truthful and reliable.

3. I am conducting an investigation of alleged violations of the Federal Firearm Laws by Jeremy Visocky of 1042 Erin Street, Madison, WI.

4. On July 24, 2010, at 11:05 p.m. Madison Police Officers were dispatched to 1042 Erin Street in response to a telephone call from Michelle Castronovo who stated that she and Jason Amundson were being held at the residence at gunpoint by an unidentified male.

5. Upon responding to the residence, officers ordered Amundson out of the east door at gun point. Shortly thereafter, Castronovo was told by police officers to go out the front door of the residence.

6. Officers learned from Amudnson that the gunman was a black male, approximately 6'01" between one hundred seventy and one hundred and eighty pounds wearing some sort of ski mask. According to Amundson, this gunman was carrying a handgun that might have had some sort of silencer on it.

7. Detective Mary Copeland of the Madison Police Department and I conducted a follow up interview of Amundson who said that the gunman had him turn around and put the gun in the back of Castronovo. The gunman told Amundson and Castronovo to get into the living room and sit down.

8. Amundson said that the gunman then continued to look around the house. Amundson said that while the gunman was walking around the house, Castronovo, called 911 to report that they were being held at gunpoint. Amundson described that she would pick the phone up and talk while the gunman was not looking at them. Amundson said that it appeared the gunman appeared to be looking for things to take in the apartment.

9. Amundson said that when the gunman realized that Castronovo had been talking on the phone, he told her to give him the phone. He added that shortly thereafter the gunman exited the apartment. Amundson estimated that approximately ninety seconds later officers responded to the residence.

10. Amundson said that he did not know what the gunman was looking for. Amundson related that although he suspected there was a second person with the gunman, he did not hear the gunman talk to the second person while he was in the apartment. Amundson said that he heard the gunman possibly say something like, "Let's get the fuck out of here," to a second person as the gunman was exiting the residence.

11. Officers at the scene observed that the east side door of the residence had been severely damaged and had been broken into multiple pieces.

2

12. The front door of the residence faces south towards Erin Street. Access to this door was via a large front porch. Inside the south side entrance was a common area that allowed access to a stairs leading to the upstairs apartment as well as an additional door to the main floor apartment that had been broken into. Officers also observed a large Stack On green safe in this common area between the main floor and upstairs apartments. The safe was a combination safe and was found lying on its left side on top of a yellow blanket. It was explained by the victims that the suspects apparently tried to carry the safe by laying it on a blanket.

13. In plain view in one of the open closets in the apartment was a cabinet containing multiple items of drug paraphernalia, including many glass pipes and a bowl, consistent with the smoking illegal narcotics. Two weights, weighing 100 and 200 grams respectively, which were consistent with the weighing of illegal narcotics for sale were also observed in plain view.

14. Also in plain view was an unlocked green ammo can with the word clips written in black magic marker on the side. Inside the case was loose ammunition, including .45 caliber ammunition and seven 7.62mm rounds. A blue backpack on the floor was open and in plain view clips (magazines) for an AK-47 rifle were observed. There were three of these clips in the back and two were found to be loaded with 7.62mm ammunition.

15. While inside the residence, a Madison Police Department K-9 alerted on a silver purse lying on the floor. A search of the purse revealed a red container filled with

three glass smoking pipes. There were also multiple pill containers in the purse that contained suspected marijuana residue. Small pieces of marijuana were also observed in the bottom of the purse.

16. It was learned by officers on the scene that the residence was rented to Jeremy Visocky. According to Castronovo, Visocky was working at The Annex bar, but could not get out of work so that he could come and speak with police. The Madison Police Department contacted The Annex bar and advised that it was a matter of public safety that Visocky return to his residence.

17. When Visocky did not return to his residence, a Madison Police Officer went to the Annex and spoke with Visocky about returning to his residence. Visocky indicated that he would return to his residence in approximately fifteen minutes.

18. After approximately thirty minutes, Visocky had not returned to his residence. Madison Police again called the The Annex and were told that Visocky was still there. Madison Police returned to the Annex, and began to look for Visocky there. Officer Dexter was told that Visocky was in different places in the bar. After being told that Visocky was in the parking lot on the east side of the building, Officer Dexter went there and was met by an individual who advised that he was Michael Schmidt, an attorney for Visocky. Schmidt further advised that Visocky did not wish to speak with police at that time stating to police, "You guys apparently scared the crap out of Jeremy and he doesn't want to talk right now."

19. Madison Police Officers took the safe, the yellow blanket and the ammo box

4

as well as assorted ammunition, and are currently in possession of all of these items.

20. On August 12, 2010, Special Agent William Baudhuin and Detective Mary Copeland interviewed Jason Amundson at 1042 Erin Street. Amundson indicated that he was not a permanent resident of the apartment, and that he only was staying there temporarily while he was getting his own apartment.

21. Amundson said that he does not keep any belongings at the apartment except for items he is storing in the basement. He stated that the drugs and drug paraphernalia found in Castronovo's purse belonged to him. He stated that other drug paraphernalia in the apartment did not belong to him. He also stated that the ammunition, magazines and gun safe did not belong to him. Amundson said that he was not aware of the fact that the gun safe was in the house.

22. Amundson said that they had come to the house on the night of the incident to let Visocky's dog out of the house because Visocky was going to be working late.

23. Upon being asked if he had spoken with Visocky about the incident, Amundson said that he had not. He said that the he did not feel like it was his business.

24. Amundson said that Castronovo does not live at Visocky's apartment.

25. A criminal history check of Visocky indicated that on November 4, 2002, Visocky was found guilty in Douglas County Wisconsin Circuit Court of possession of THC.

26. On January 9, 2009, Visocky was arrested for operating a motor vehicle

5

while intoxicated by officers from the Madison Police Department. During the course of this arrest, Visocky was placed in a squad car. After he was removed from the squad, an officer found a marijuana pipe lying in the backseat of the squad car.

27. I know that pursuant to Title 18, USC, Section 922(g)(3) - it is unlawful for any person who is an unlawful user or addicted to any controlled substance to possess firearms or ammunition.

28. The safe recovered from 1042 Erin Street is a green metal Stack On safe, approximately 5 feet tall, bearing serial number Y610DG000586. Based on my training and experience, this safe is consistent with safes typically designed to safeguard firearms and other items in private homes.

29. I also know that based on my training and experience, in a residence where magazines and ammunition are found, that firearms are often found as well. Additionally I know based on my training and experience that persons involved in the use and sale of narcotics will maintain narcotics, currency, and firearms in a locked safe.

Dated this 24th day of August 2010.

*[signature]*

WILLIAM BAUDHUIN
Special Agent
Bureau of Alcohol, Tobacco,
Firearms, and Explosives

Sworn to before me this 24TH day of August 2010

*[signature]*

STEPHEN L. CROCKER
United States Magistrate Judge

6