IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                    Plaintiff,

v.

JEREMY VISOCKY,

                    Defendant.

REPORT AND RECOMMENDATION

10-cr-152-wmc
_____

## REPORT

On October 6, 2010, the grand jury charged defendant Jeremy Visocky with being an unlawful marijuana user in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3). Visocky has moved to dismiss the indictment and to suppress the firearm seized from a safe removed from his property by the police. *See* dkts. 13 and 14. For the reasons stated below, I am recommending that this court deny the motion to dismiss and grant the motion to suppress.

## I. Motion To Dismiss the Indictment

Visocky contends that the indictment must be dismissed because the charging statute, 18 U.S.C. § 922(g)(3), is unconstitutional. *See* dkt. 13. Visocky acknowledges that the Court of Appeals for the Seventh Circuit recently held that this statute is constitutional, *see United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), but he wishes to preserve the issue pending any Supreme Court review of *United States v. Skoien,* 614 F.3d 638 (7th Cir. 2010)(*en banc*), the case on which *Yancey* principally relies, and which Visocky contends was wrongly decided. Fair enough: Visocky has preserved the issue and this court should deny his motion to dismiss.

**II. Motion To Suppress Evidence**

Visocky has moved to suppress the firearm that forms the basis of the charge against him, asserting that the police discovered and seized it in violation of his Fourth Amendment rights. Visocky is not challenging the search warrant subsequently issued by this court. The parties did not ask for an evidentiary hearing; the material facts are gleaned from law enforcement reports and are not disputed:

FACTS

Around 11:00 p.m. on July 24, 2010, officers from the Madison Police Department responded to a report of an armed burglary in progress at 1042 Erin Street, Apartment 1, in Madison. After the police had secured the scene, Jason Amundson and Michelle Castronovo emerged from the kicked-in side door of the first floor apartment and identified themselves as the people who had called 911. They explained that they did not live in the apartment, but their friend Jason Visocky did. Amundson and Castronovo had come over to let out Visocky's dog because Visocky was working late at a music club up the street. Upon entering the apartment they were confronted by a masked burglar brandishing a handgun, who apparently had an unseen accomplice. The burglar briefly held Amundson and Castronovo hostage, then fled with his accomplice before the police arrived.[1]

Officers entered the apartment to conduct a protective sweep. Inside the apartment, the officers observed in plain view drug paraphernalia, two small weights (100 gm & 200 gm), an

---

[1] The burglar had ordered Amundson and Castronovo to sit on the living room floor while he searched the residence. While the burglar looked elsewhere, Castronovo called 911 on her cell phone.

ammunition can labeled "clips" with loose .45 caliber and 7.62mm rounds inside, and an open backpack containing three banana ammo clips for an AK-47 rifle, one of which was loaded with what appeared to be 7.62mm rounds. They also saw a television, a computer and a Playstation. In the common hallway/stairwell outside the front entrance to Apartment 1, police observed a five-foot tall green metal safe (which they recognized as a gun safe) on its side on a blanket. Amundson and Castronovo explained that the burglars apparently had tried to carry away the safe on the blanket.

   A trained police dog was brought to the scene to track the burglars but did not pick up their trail. The dog then switched to drug detection mode to sniff the apartment and the safe (described in the dog handler's report as "the locker that was removed from the apartment and in the common hallway," dkt. 14, Exh. 5 at 2). The dog did not alert to the safe but it found a small amount of marijuana and glass pipes in a purse that Amundson later admitted he owned. An evidence technician photographed the scene, bagged the blanket for the purpose of attempting to collect the burglar's DNA, dusted the safe for fingerprints (finding none), and swabbed all eight corners of the safe for DNA.

   Over the course of the evening, one of the officers actually visited Visocky twice at work (the music club was less than a mile from Visocky's apartment). During the first visit he promised promptly to return to his apartment and talk with the police, but he never did. When the officer returned to the club to attempt to talk to Visocky again, a man identifying himself as Visocky's lawyer told the officer that "you guys apparently scared the crap out of Jeremy and he doesn't want to talk right now." At this juncture, the police decided to gather and seize certain items from the apartment, ostensibly for safekeeping, because Visocky was not home and

his apartment could not be secured.[2] The police took the gram weights, the ammunition and clips, the drug paraphernalia and the gun safe. They left Visocky's computer, television and Playstation in the unsecured apartment.

The police held onto Visocky's property for a month without doing any further testing of the safe, and apparently without doing much additional investigation of the burglary. On August 24, 2010, the police, working with the ATF, sought and obtained a search warrant for the safe from this court. The police opened the safe on August 27, 2010. They found a Norinko SKS rifle, ammunition, suspected marijuana, a key to Visocky's apartment, car keys with a key fob, a motor vehicle title, and a box of Visocky's personal checks. Between July 24 and August 27, 2010, the police did not attempt to contact Visocky to discuss returning his safe, and Visocky did not contact the police to request that his safe be returned.[3]

## ANALYSIS

Visocky contends that the evidence retrieved from his safe must be suppressed because it was constitutionally unreasonable for the police to seize his safe and then hold it for thirty days before seeking a search warrant. The government responds that Visocky abandoned the

---

[2] In his report, the forensics officer states "Due to the fact that we could not positively identify the safe lying in the common hallway of this residence to be the potential victim's, we decided to take the safe for safekeeping . . . . This was for safekeeping purposes due to the fact that we were not going to leave the safe inside an unsecurable house with the victim not at home." Dkt. 19, Exh. 1 at 2

[3] The only police report to indicate that the police alerted Visocky that they had his safe states that the reporting officer telephoned Visocky's attorney on August 27, 2010 to tell him what they had found in the safe. *See* dkt. 14, exh. 8 at 3.

safe, the seizure was reasonable, the delay was reasonable, and in any event, suppression is not the appropriate remedy. I deal with each point in turn:

### (1) Visocky did not abandon his safe

It is incredible for the police to claim that when they found a gun safe lying on its side on a blanket in the hallway, they were unsure whether the burglars had dragged it out of Visocky's apartment. Not only does this flout common sense and the fundamentals of crime scene investigation, the officer who voiced this doubt as justification for seizing the safe contradicts himself by tying the safe to the unsecurable apartment. The other police reports that touch on this topic clearly connect the safe (or "locker") to Visocky's apartment. In a related point, the purported rationale for seizure–to ensure that these items were not stolen from an unsecured apartment to which the owner had not returned–is equally incredible. As Visocky notes, the only items the police chose to secure were those with potential evidentiary value against him. The police showed no concern for Viscocky's television, computer or game console, items that were significantly more appealing to and transportable by crime scene vultures than a large, heavy gun safe.

The government then contends that "by failing to return home to identify the safe as his, Visocky abandoned his property interest in the safe," and that he amplified this failure by not seeking the return of his property. The government disputes that the police were obliged to contact Visocky in an effort to return his property. Gov. Brief, dkt. 19, at 3. First, although it would be reasonable for the court to surmise that Visocky was aware that the police, not the burglars, had taken his safe, there is no evidence of this. Second, even if Visocky knew or

5

inferred that the police had seized his safe, the fact that he hadn't asked for its return within 30 days return does not prove that he had abandoned it.  Visocky is not required to prove he *didn't* abandon his safe, the government is required to prove that he *did*, by preponderance of the evidence.  The test is objective: would a reasonable person in the position of the investigating officers believe, from Visocky's external manifestations of his intent, that he had chosen to relinquish his property interests in the safe?  *United States v. Alexander*, 573 F.3d 465, 472 (7th Cir. 2009) *Id.*  There is no evidence that Visocky ever disclaimed ownership in the safe, either proactively or in response to police inquiry.  Although the court could hypothesize a set of facts in which a person's failure to ask the police to return his property might establish an intent to relinquish it, those facts would have to be much more compelling than the facts presented here.  In short, Visocky did not abandon his property.

    **(2) It was reasonable to seize the safe**

The government argues that the police seized Visocky's safe to keep it secure during his absence from his burglarized apartment.  This is not credible because the police only seized items that might prove Visocky's possession of drugs or firearms while leaving behind Visocky's more valuable property.  Further, as noted above, there is no evidence in this record that the police ever told Visocky that they had taken his property, or told him that they took it to protect it from further burglary attempts, or told him that he was free to arrange to retrieve his property from the police at his convenience.  Would the police have given Visocky back his safe without opening it first if Visocky had come to retrieve it the next morning?  We'll never know.

6

The government next argues that the safe was evidence of the burglary. But as Visocky observes, the forensics officer dusted and swabbed the safe at Visocky's apartment and did not test it further after seizing it. The next act, 30 days later, was to obtain a warrant, drill open the safe and look inside. The only logical inference to draw from these facts is that the police intended to secure the safe's contents from Visocky until they had an opportunity to look inside for drugs and guns.

This intent implicated Visocky's Fourth Amendment right to possess his safe free from the government's unauthorized exercise of dominion over it (which was separate from his right to privacy in the safe's contents). *See United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009). Even so, the seizure itself would not be unconstitutional if the police then and there had probable cause to believe that it held contraband or evidence of a crime *and* if exigent circumstances demanded that they seize the safe pending issuance of a warrant to examine its contents. *Id.* Even if the police had no more than reasonable suspicion that the safe contained evidence, this might suffice to justify the initial seizure, at least briefly. As the court held in *United States v. Marrocco*, 578 F.3d 627, 633 (7th Cir. 2009), the Fourth Amendment allows seizure and limited investigative detention of a train passenger's luggage upon reasonable suspicion that the luggage contained narcotics. Any such detention, however, must be reasonable in time and scope given the totality of circumstances involving the investigatory act. "Even if the decision to detain a suitcase is made on the basis of reasonable suspicion, the duration of the detention may abridge constitutional standards." *Id.*, quoting *United States v. Sterling*, 909 F.2d 1078, 1083 (7th Cir. 1990).

Here, notwithstanding the police dog's failure to alert to the safe, the police had at least reasonable suspicion to seize the safe on the ground that it might contain evidence of drug trafficking and/or a firearm that could be connected to drug trafficking. Whether the police had probable cause at that juncture is a closer question. The subsequent search warrant application relied on a suspected § 922(g)(3) violation, which is an obscure but undemanding statute, and the warrant application set forth Visocky's criminal history, which amplified the evidence of his personal drug use.[4] There is no indication that this additional information could not have been gathered by the police and presented to the court within a day after seizing Visocky's safe. Therefore, the seizure of Visocky's safe, regarded in isolation, does not appear to have violated his Fourth Amendment rights. If the police promptly thereafter had sought a search warrant, then the suppression analysis likely would be over.

But the police did not promptly seek a warrant. They parked Visocky's safe in the evidence room for 30 days and did nothing.

**(3) It was unreasonable to hold the safe without seeking a warrant**

Even if the police had bona fide reasons for this 30 day delay, they are irrelevant. As the case law makes clear, once the exigencies that justified the warrantless seizure have dissipated, the police promptly must seek a search warrant. The delay itself is the misconduct, regardless why it occurred. *See, e.g., United States v. Mitchell*, 565 F.3d 1347, 1352-53 (11th Cir. 2009) (on facts presented, it was unreasonable for government to wait 21 days after seizing defendant's

---

[4] The police also re-interviewed Amundson with an ATF agent present, but he didn't say anything that added to the probable cause.

computer to obtain warrant to search its contents).  Citing to *Mitchell*, 565 F.3d at 1352, Visocky argues that he could have had "irreplaceable and personal effects" and valuables in his safe.  Arguing in the abstract is the correct approach because it is irrelevant what else actually was in Visocky's safe.  The point is that the police knew–or should have known–that people routinely keep non-contraband valuables in safes, and these valuable are not subject to seizure by the state.  Therefore, the police had an obligation–of constitutional dimension–to seek a warrant quickly so that contraband could be seized and non-contraband could be returned.  That's not what the police did here.  Therefore, it was constitutionally unreasonable for the police to hold Visocky's safe for a month without seeking a search warrant.

**(4) Suppression is the appropriate remedy**

"Suppression of evidence . . .  has always been our lasts resort, not our first impulse."

*Hudson v. Michigan,* 547 U.S. 586, 591 (2006).

Although the Supreme Court has retrenched the exclusionary rule, it has not yet abrogated it, and perhaps never will.  *See United States v. Simms*, 626 F.3d 966, 969 (7th Cir. 2010); *cf. United States v. Sims*, 553 F.3d 580 583- 85 (7th Cir. 2009)(predicting the forthcoming demise of the exclusionary rule in favor of civil rights lawsuits).  Here's the current rule:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the judicial system.  As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Herring v. United States*, 555 U.S. 135, 126 S.Ct. 695, 702 (2009)

No clear picture has emerged yet from the Seventh Circuit on how it gauges the impact of *Herring* and *Hudson*. In *United States v. Crowder*, 588 F.3d 929 , 934 (7th Cir. 2009), decided on the defendant's lack of an expectation of privacy, the court observed in *dicta* that courts usually exclude evidence obtained in violation of the Fourth Amended, then tempered this observation with a "*but see*" citation to *Herring*, 129 S.Ct. at 700. *See also United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009) (same). In *Guzman v. City of Chicago*, 565 F.3d 393, 398 (7th Cir. 2009), a civil rights lawsuit he court found a constitutional violation based on the officers' reckless execution of a search warrant after learning facts that should have alerted them that their warrant was wrong. The majority then offered in dicta its view that *Guzman* "may illustrate our recent observation that in some ways it is easier to protect Fourth Amendment rights through civil actions, rather than through the suppression of evidence in criminal cases." *Id.* at 398, Citing *Herring* and *Hudson*, the court noted that suppression is a last resort, that exclusion is not a necessary consequence of a Fourth Amendment violation, and the benefits of exclusion must outweigh the costs, costs that are not a concern in civil cases. As an example, the court noted that civil rights lawsuits did not raise concerns that illegally seized evidence essential to convicting a defendants of a grave crime might have to be suppressed and the criminal let go to continue his career of criminality, even if the harm inflicted by the illegal search to the interests protected by the Fourth Amendment was slight in comparison to the harm to society of letting the defendant off scot free. *Id.* at 399. Judge Rover offered a concurrence joining the result but scolding the majority for its gratuitous musings on the continued vitality of the exclusionary rule. *Id.* (Rovner, J., concurring).

Judge Rovner was on the panel in *United States v. Elst*, 579 F.3d 740 (7th Cir. 2009) in which the court declined to suppress evidence obtained by the officers in the good faith execution of a search warrant that lacked probable cause. The court cited *Herring* for the proposition that exclusion of evidence is an extreme sanction that applies only where it would result in appreciable deterrence. The court found that "it would not here." *Id.* at 747.

This review of circuit cases does not provide much useful guidance beyond the Supreme Court's own observations and admonitions in *Herring* and *Hudson:* a court should not suppress evidence in a criminal case unless it finds a need to deter police conduct that violated a suspect's rights in a manner that exceeds mere negligence. To recapitulate, "the extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Herring*, 129 S.Ct. at 701.

So how should this court characterize the decision by the Madison Police Department to hold Visocky's safe for 30 days before seeking a warrant? There is no evidence that the officers intentionally flouted the requirement that they quickly seek a warrant; on the other hand, there is no evidence that they could not have presented a warrant application to a court within a day or two after seizing the safe. The evidence available to the court suggests that the police didn't hurry because they didn't know they were supposed to. Thus, what we have here is a mistake of law.

In *United States v. Song Ja Cha*, 597 F.3d 995 (9th Cir. 2010), the Court of Appeals for the Ninth Circuit faced an analogous but not identical situation: police had seized defendant's residence and adjoining business without a warrant, then excluded the occupants overnight; by the time they applied for and obtained a warrant, at least 26 hours had passed. The court held

11

that this was an unreasonable delay, and that it surpassed mere negligence. Citing to *Herring*, the court noted that conduct triggering the exclusionary rule must be sufficiently deliberate that it can be deterred, and that the inquiry is objective, not subjective: that is, would a reasonably well-trained officer have known that this seizure was illegal? *Id*. at 1004-05. This emphasis on objective reasonableness is "paramount" because the officers had made a mistake of law by not realizing that a seizure must last no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant. Under Ninth Circuit law, there is no good-faith exception to the exclusionary rule for police who do not act in accordance with governing law because this would remove the incentive for police to ensure that they properly understand the laws they are entrusted to enforce and obey. *Id.* The court then found that the police *department* had been reckless for not having trained its officers sufficiently on search warrant requirements, and that the officers' nonchalance toward the seizure and the attempt to obtain a warrant was sufficiently culpable to warrant exclusion of the evidence seized. *Id.* at 1005-06.

Although the Ninth Circuit's treatment of mistakes of law is not binding on this court, the analysis in *Son Ja Cha* would seem to apply here. Madison police, responding to an emergency call of an armed burglary, stumbled across evidence suggesting that the burglary victim probably used marijuana, might sell it, and probably possessed an assault rifle. When the victim rebuffed their attempts to interview him (lawyering up in a flash), the police secured evidence against him on a ruse and then sat on it for a full month, not realizing that they were legally required either to seek a warrant post haste or return the property. Without attributing any *scienter* to the officers, this court can find that this behavior was objectively unreasonable,

12

systemic, capable of being repeated, and therefore capable of being deterred department-wide in the future. Therefore exclusion may be appropriate.

Weighed against this would be the cost to society of quashing this particular prosecution when Visocky has not demonstrated any actual harm from the delay. Starting with the second point, the police search of Visocky's safe revealed documents and items that were personal and useful to Visocky in the ordinary course, but he has not alleged or proved that he was harmed, or even inconvenienced by lack of access to these items for a month. Bridging to the first point, it is worth noting that the firearm found in the safe is not contraband *ipse*: although the Norinco SKS is a powerful assault rifle, it is a legal weapon that can be possessed by a non-prohibited person. Visocky is not obviously and conclusively a prohibited person: he is not a convicted felon, a fugitive from justice, a "mental defective," an illegal alien, a dishonorably discharged soldier, nor a domestic violence convict. *See* 18 U.S.C. § 922(g). Rather, the government alleges that on July 23, 2010, Visocky was an unlawful user of marijuana. This status subjects him to a felony conviction for possessing a firearm. Undoubtedly, the police and the government suspect that there is more to Visocky's story that the one-sentence indictment would suggest, but the objective evidence in the record does not suggest that the societal cost of letting Visocky walk away from this prosecution would greatly outweigh the need to ensure that local law enforcement officers understand and comply with the warrant requirements of the Fourth Amendment.

Accordingly, I am recommending that this court grant Visocky's motion to suppress evidence.

RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court:

(1) DENY defendant's motion to dismiss the indictment.

(2) GRANT defendant's motion to suppress evidence.

Entered this 11th day of January, 2011.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

January 11, 2011

Rita Rumbelow
Assistant United States Attorney
660 West Washington Avenue, #303
Madison, WI 53703

Michael Lieberman
Federal Defender Services of Wisconsin, Inc.
222 West Washington Avenue, Ste. 680
Madison, WI 53703

     Re: United States v. Jeremy Visocky
          Case No. 10-cr-152-wmc

Dear Counsel:

    The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

    The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

    In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before January 21, 2011, by filing a memorandum with the court with a copy to opposing counsel.

    If no memorandum is received by January 21, 2011, the court will proceed to consider the magistrate judge's Report and Recommendation.

                                  Sincerely,

                                  /s/

                                  Connie A. Korth
                                  Secretary to Magistrate Judge Crocker

Enclosures
cc:    Honorable William M. Conley, District Judge

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation.  Any written objection must identify specifically all proposed

findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections.  An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection.  Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects.  The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection.  The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions.  The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.**  *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).