UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.                                        Case No. 10-cr-152-wmc

JEREMY VISOCKY,

    *Defendant*.

---

## DEFENDANT'S RESPONSE TO GOVERNMENT'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In its Objection to the Magistrate Judge's Report and Recommendation, (dkt. 25) the government advances several theories as to why suppression is not warranted. None help the government's cause. The conclusion remains the same: the investigating officers violated the Fourth Amendment when they interfered with Visocky's possessory interest in the safe for an unreasonable length of time. To deter such violations in the future, suppression is the appropriate remedy.

**I.**     **The Government's Objections Add Nothing of Significance to the Analysis.**

The government raises fact-based objections to the Magistrate Judge's findings. Whatever validity some of those factual corrections might arguably have, they are irrelevant to the determination of whether law enforcement's prolonged interference with Visocky's possessory interest in the safe was unreasonable under

the circumstances.

As an initial matter, the government expends a great deal of energy justifying the initial seizure of the safe. Visocky, however, does not challenge the initial seizure of the safe. Rather, the issue is whether holding the safe for thirty days without taking any additional steps to further its investigation was constitutionally unreasonable. Whether or not the police cited "public safety" as the reason for the safe's initial seizure is irrelevant. For purposes of argument, Visocky acknowledges that a brief, warrantless seizure of his safe may have been constitutional. A 30-day seizure clearly was not. That is what is what the Magistrate Judge concluded and it is what this Court is now being asked to review.

In a similar vein, the government continues to advance the argument that Visocky somehow abandoned his interest in the safe. This theory flies in the face of settled authority that requires the government to prove explicit abandonment. *See* Defendant's Reply in Support of Motion to Suppress, dkt. 21, at 2-6; Report and Recommendation, dkt. 22, at 5-6. The burden of proof to establish abandonment rests on the government and the government has failed to meet its burden.

Moreover, many of the government's nit-picking factual objections are inconsequential to the analysis. For instance, the government criticizes the Magistrate Judge for "failing to . . . acknowledge" that the police contacted Visocky *three* times before taking the safe, as opposed to the two times the Magistrate Judge

found. Dkt. 25 at 2. Even assuming this distinction matters, which it does not, the evidence in the record supports the Magistrate Judge's conclusion. One police report, which was attached to Visocky's motion, gives the following account: "Officer Dexter went to the renter's place of business, the Annex Bar on Regent Street. The resident was supposed to come back to his apartment. He failed to do so, so Dexter made a second trip to the Annex to make contact with the potential victim's lawyer." Dkt. 19-1 at 2. More importantly, it does not matter how many times police officers visited Mr. Visocky at work the night of the burglary. What ultimately matters is that the officers failed to inform Visocky that they would be removing his possessions from the residence. Without knowing the police were planning to take his safe, Visocky could not possibly have manifested an intention to abandon it.

On this point, the magistrate judge was correct in finding that the police never gave Visocky any indication that they would be seizing his safe on the night of the burglary, nor that he was free to pick it up from the police station at his convenience. Dkt. 22 at 6, Dkt. 25 at 3. The government does not point to anything in the record to establish Visocky was aware of the seizure before or after the fact. Rather, the government speculates that Visocky's friends, who were present at the house at some point during the police presence, must have known the police were planning to take the safe. Dkt. 25 at 3. At the same time, however, the government notes that

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Visocky's house was "unsecured" at the time the police concluded their investigation. Dkt. 25 at 3. This concession dooms the government's point: If Visocky's friends were still there when the police left, then the house would not have been "unsecured." On the other hand, if the friends were not still there, they could not have known the police decided to take the safe. Likewise, if they didn't know the police decided to take the safe, they could not have informed Visocky of that fact. Without any knowledge the police were planning to take his safe, Visocky could not possibly have manifested an intention to abandon it.[1]

The government also incorrectly asserts that the police officers on the scene of the burglary "could not positively identify the safe as belonging to Visocky." Dkt. 25 at 3. This assertion is plainly refuted by the police reports. As the Magistrate Judge correctly noted, the forensic officer's report was self-contradictory. At one point, the officer asserted that the owner of the safe could not be positively identified. Then, he goes on to say that "we were not going to leave the safe inside an unsecurable house with the victim not at home." Dkt. 22 at n. 2. The Magistrate Judge correctly concluded that this claim is simply not credible. Dkt. 22 at 6.

Finally, the government relies upon the safe's purported evidentiary value as a basis for its prolonged seizure. As with its other claims, this one also fails. The

---

[1] The government's assertion that it somehow was Visocky's lawyer's fault that the police were unable to inform Visocky that his safe would be confiscated, dkt. 25 at 3, is equally illogical. The police had a conversation with Visocky's lawyer and could have informed him at that time that items were going to be seized from Visocky's residence. They did not do so.

4

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

police collected any and all evidence that could be obtained from the safe on the night of the burglary. According to the report of Investigator Parr, which was attached to the government's response, officers dusted the safe for latent fingerprints before leaving Mr. Visocky's residence. Dkt. 19-1 at 1.[2] The only additional testing performed on the safe after it was seized was the search performed pursuant to the warrant.

## II. The Magistrate Judge Was Correct In Finding That The Exclusionary Rule Applies

Law enforcement officers identified no acceptable reason why prolonged possession of the safe was necessary. Any exigent circumstances that might have existed at the time of the initial seizure had subsided well before the 30-day mark when officers finally decided to obtain a warrant. The exclusionary rule is in place to deter this type of clear disregard of a suspect's Fourth Amendment interests.

As noted by the Magistrate Judge, suppression decisions necessarily involve interest-balancing. Dkt. 22 at 9, citing *Herring v. United States,* 555 U.S. 135, 129 S. Ct. 695, 702 (2009) ("[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.") In

---

[2] The police reports confirm that any additional testing relating to the gun safe was performed on the swabs that had been taken of the safe, not on the safe itself. The government cites the Receipt of Physical Evidence, dkt. 19-3, for the proposition that the safe underwent additional testing related to the burglary investigation. Close reading of this document confirms that the *swabs from the safe* were submitted to the State Crime Laboratory on October 4, 2010. (*Id.*) These swabs were collected the night of the burglary.

*Herring,* for instance, police officers pulled over, arrested and searched the defendant after learning that the defendant had a warrant out for his arrest in a neighboring county. It turned out that the warrant faxed to the arresting officers had been recalled five months earlier. *Id.* at 698. The search based on the faulty warrant revealed that the defendant was in possession of a firearm, as a convicted felon, and methamphetamine. The Court found that the probable cause determination upon which officers relied to arrest the defendant was based on reasonable but mistaken assumptions and, as such, the exclusionary rule was an inappropriate remedy. The *Herring* court clarified that, "[w]e do not suggest that all recordkeeping errors by the police are immune from the exclusionary rule. In this case, however, the conduct at issue was not so objectively culpable as to require exclusion. " *Id.* at 703, n. 4.

The government takes the Supreme Court's holdings in *Herring* and *Hudson v. Michigan,* 547 U.S. 586, 591 (2006) to mean more than they say. Under the government's understanding of the cases, the exclusionary rule would never be invoked. Rather, what the Supreme Court has said is that circumstances matter. The 30-day warrantless seizure of Visocky's safe is not straddling the constitutional line. It was a clearly and unjustifiably excessive period of time to maintain control over someone's property. There is no indication that officers made a good faith effort to secure a warrant at an earlier time. This was pure disregard for Visocky's possessory interest in the safe. Any reasonable officer should know that he/she does not

6

possess unrestrained access to evidence.

As correctly recognized by the Magistrate Judge, the conduct of the police in this case demonstrates a profound misunderstanding on the part of the Madison Police Department as to its power to deprive citizens of their property. Dkt. 22 at 12-13. This is precisely the type of reckless disregard that the exclusionary rule is designed to deter. Suppressing the evidence in this case would give the police the incentive they need to learn the limits of their constitutional power.

Contrary to the government's suggestion, *Herring* does not stand for the proposition that only intentional, reckless or grossly negligent conduct justifies suppression. *See* dkt. 25 at 6. To the contrary, *Herring* involved a unique factual setting in which it was clear that the police officers did nothing wrong; they arrested someone based on what appeared on its face to be a valid warrant. The error resulted from a clerical mistake made by an office clerk who failed to remove the warrant from the system after it had been withdrawn. Where the police officers did nothing wrong, the Supreme Court correctly concluded that no deterrent effect would flow from suppressing the evidence.

In the instant case, in contrast, the wrongdoing was on the part of the police officers. Whether it was due to ignorance, laziness, or malfeasance doesn't matter. The officers violated Visocky's rights by depriving him of his property for an unreasonably long period of time without obtaining a warrant. Whatever the cause of this misconduct, depriving the police of the fruits of their misconduct will

certainly prevent the conduct from recurring.  Preventing this type of misconduct is what the exclusionary rule is designed to do.

### III.   Conclusion

For the foregoing reasons, as well as those set forth in Visocky's briefs in support of his motion to suppress and the Magistrate Judge's Report and Recommendation, the Court should overrule the government's objections, and grant the motion to suppress.

Dated at Madison, Wisconsin February 1, 2011.

Respectfully submitted,
JEREMY VISOCKY, *Defendant*

*/s/ Michael W. Lieberman*
Michael W. Lieberman, Bar # 1059034

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
222 West Washington Avenue, Suite 680
Madison, WI 53703
Tel: 608-260-9900
Fax: 608-260-9901
michael_lieberman@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing to be served via the Court's CM/ECF system to Assistant United States Attorney Rita Rumbelow, this 1st day of February, 2011.

                                                                        */s/ Michael W. Lieberman*
                                                                        Michael W. Lieberman